# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **RODNEY L. SCOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-cv-00394-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| *sued as Carolyn W. Colvin, Acting* | ) | |
| *Commissioner of SSA,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Rodney L. Scott appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Scott applied for DIB and SSI in January 2012, alleging disability as of August 1, 2009.[2] (DE 10 Administrative Record ("AR") 174-83). Scott was last insured for DIB on September 30, 2013 (AR 212), and thus, with respect to his DIB claim, Scott must establish that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997)

---

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

[2] Scott had previously filed a claim for DIB and SSI, which was denied by an administrative law judge on August 3, 2011. (AR 18). The ALJ declined to reopen that decision (AR 18), and Scott does not challenge that finding.

(explaining that with respect to a DIB claim, a claimant must establish that he was disabled as of his date last insured in order to recover DIB).

The Commissioner denied Scott's application initially and upon reconsideration. (AR 110-17, 121-26). After a timely request, a hearing was held on September 5, 2013, before Administrative Law Judge William D. Pierson ("the ALJ"), at which Scott, who was represented by counsel; his sister; and a vocational expert, Sharon Ringenberg (the "VE"), testified. (AR 40-83). On February 3, 2014, the ALJ rendered an unfavorable decision to Scott, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of unskilled, sedentary jobs in the economy. (AR 18-33). The Appeals Council denied Scott's request for review (DE 1-14, 317-22), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Scott filed a complaint with this Court on December 18, 2014, seeking relief from the Commissioner's final decision. (DE 1). Scott advances two arguments in this appeal: (1) that the ALJ failed to consider his medical impairments in combination when determining his residual functional capacity ("RFC"), and (2) that the ALJ improperly discounted the credibility of his symptom testimony. (DE 18 at 8-13).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Scott was 48 years old (AR 211); had a ninth grade education with some special education classes (AR 47, 109, 217); and possessed past work experience as a laborer, a plater, and a yardman (AR 217, 223, 248). He alleges disability due to: adjustment disorder with depressed mood, a learning disorder, borderline intellectual

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 488-page administrative record necessary to the decision.

functioning, chronic obstructive pulmonary disease ("COPD"), pinched nerve in his left elbow with acute denervation of the ulnar nerve innovated muscles in his left hand, post-left ulnar transposition surgery, left knee problems, dilated left upper urinary tract, markedly enlarged left kidney, marked renal parenchymal thinning/atrophy, and severe hydronephrosis. (DE 18 at 2).

### A. Scott's Testimony at the Hearing

At the hearing, Scott testified that he was single and that he had been living with his brother-in-law and his nephew for the past year. (AR 45). He had been receiving Medicaid up until three or four months before the hearing. (AR 45-46). He had not driven for several months because his auto insurance had expired. (AR 47). Scott testified that he had worked part time in several positions through a temporary service after his alleged onset date; however, he could not perform the required lifting for at least one of the positions. (AR 47-49). Scott states that in a typical day, his breathing problems wake him up at 4:00 a.m. (AR 55). He drinks a cup of hot coffee, which "sometimes loosens [his phlegm] up," and he then coughs and hacks to "get[] that stuff out of [his] system." (AR 55). Then he sits and watches traffic or does a word search, and he heats up a frozen meal or soup for lunch. (AR 64-65). His brother-in-law and nephew perform the household chores, although Scott will occasionally vacuum. (AR 65-66). Scott sleeps about four hours a night and then naps for several hours during the day. (AR 55-56, 62-63).

Scott complained of pain in his back, hips, thighs, right ankle, and right leg; his back pain was centered right above the belt line. (AR 54). He stated that he gets sharp pain in his back after walking a half-block; the pain in his legs feels like a muscle spasm. (AR 54). He estimated that he could sit for 30 minutes, walk a half-block before needing to sit down, and stand for an

hour before needing to lean on something.  (AR 57, 59).  He takes a cane with him when going out, but uses it only some of the time.  (AR 66).  He stated that he could not use his left arm much because of numbness, but he could lift up to 30 pounds with his right arm.  (AR 57-59).  Scott further testified that he becomes short of breath when walking fast, but does not become short of breath if he walks at his own pace.  (AR 57).  He was not taking any breathing medications at the time due to his loss of Medicaid benefits.  (AR 56).  He also complained of having a "bad right eye."  (AR 64).

As to his reading and writing abilities, Scott testified that he could complete written job applications, stating that he writes "N/A" when he does not comprehend what is being asked.  (AR 60).  He particularly has difficulty when taking a test on a timed basis.  (AR 60).  He twice tried to obtain his GED at night school, but was unsuccessful.  (AR 60).  He thought that his sister, as well as others, could read and understand a grocery list that he had written.  (AR 61).  He stated that he could probably read a grocery list written by someone else, and that he would ask for assistance if he had difficulty doing so.  (AR 61).  Scott testified that he feels depressed "[s]ometimes here and there," causing him to sleep more, stay home, and do nothing.  (AR 61-62).[4]

### B.  Summary of the Relevant Medical Evidence

In September 2009, an MRI showed a massively dilated left upper urinary tract which markedly enlarged the kidney and resulted in marked renal parenchymal thinning/atrophy.  (AR 325).   In December 2011, Scott saw Justin Grannell, M.D., for knee pain, reporting that he had recently twisted his knee and felt it pop.  (AR 341).  An X-ray showed moderate suprapatellar

---

[4] Scott's sister also testified at the hearing, essentially corroborating his testimony.  (AR 67-72).

joint effusion.  (AR 346).  Dr. Grannell diagnosed capsular strain versus meniscal tear.  (AR 338).  The following month, Scott saw Keith Derickson, M.D., for his knee, reporting that his pain was decreasing.  (AR 332).  His knee pain was relieved by medication and by elevating his leg.  (AR 332).  He had a chronic cough, but normal breathing sounds with no crackles, rhonchi, or wheezes; he had no difficulty breathing.  (AR 333).  His thorax was symmetric with good expansion, and he did not use accessory muscles when breathing.  (AR 333).  An inhaler was prescribed for use as needed for shortness of breath or wheezing.  (AR 335).  On a pulmonary function test in February 2012, Scott's best pre-bronchodilator FEV 1 was 2.83.  (AR 385).

In February 2012, Candace Martin, Psy.D., evaluated Scott at the request of Social Security.  (AR 351-55).  On mental status examination, Scott's conversation was logical, relevant, and coherent, but many of his responses displayed lower intellectual functioning, verbal response latency, and perseveration.  (AR 353).  His mood appeared depressive and discouraged, and his affect was appropriate to his mood.  (AR 353).  He demonstrated adequate attention, concentration, and verbal concepts; good long term and intermediate memory; marginal social skills; poor abstract reasoning; and weak judgment, insight, mentation, and short term memory.  (AR 353-54).  Dr. Martin concluded that Scott's depression seemed to be secondary to his multiple physical complaints, unemployment, and change in housing situation.  (AR 354).

Dr. Martin also observed that Scott had a history of limited education and some difficulty with reading and math skills.  (AR 354).  She found that Scott's responses on the mental status examination suggested that he was probably functioning in the borderline range of intelligence, which would impact his ability to perform certain jobs.  (AR 354).  She concluded that he was able "to work in jobs that require simple, repetitive, and well learned tasks that do not require

good skills in reading or mathematics." (AR 354). Her diagnostic impression on Axis I was adjustment disorder with depressed mood, learning disability not otherwise specified; on Axis II, probable borderline intellectual functioning; on Axis III, multiple physical complaints; on Axis IV, coping with chronic physical complaints, unemployment, variable housing situations, inadequate finances, and limited social support; and on Axis V, a Global Assessment Functioning ("GAF") score of 45.[5] (AR 355).

That same month, Scott was examined by H.M. Bacchus, M.D., at the request of Social Security. (AR 357-59). Scott appeared at the examination with a cane. (AR 358). Dr. Bacchus observed that Scott's mental processes appeared somewhat sluggish, that he moved slowly to and from the exam table and chair, and that he became mildly short of breath with exertion; Scott still smoked six to seven cigarettes a day. (AR 357-58). With the cane, Scott's gait was steady with fair sustainability on even ground, but without the cane, his gait was slower and more antalgic. (AR 358). He had some difficulty with heel, toe, and tandem walk, and he did not hop due to knee pain; he could squat one-third of the way down with support. (AR 358). He exhibited range of motion deficits in his neck, low back, left shoulder, hips, knees, and right ankle. (AR 358). A straight leg raise was 70 degrees on the right and 90 degrees on the left.

_____

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Dr. Martin used a GAF score in assessing Scott, so it is relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

(AR 358).  He had tenderness to palpation and range of motion to the left shoulder with mild crepitus.  (AR 358).  His muscle strength and tone ranged from 4-5/5, his grip strength was 4/5 bilaterally, and his sensation was intact.  (AR 358).

As to mental status, Dr. Bacchus noted that Scott appeared somewhat slow cognitively, but that he had a fair memory and was able to follow simple instructions.  (AR 358).  Dr. Bacchus concluded that Scott retained the physical functional capacity "to engage in light to moderate work duties, at least part-time, and repetitive in nature," but he had some limitations with respect to prolonged walking, prolonged climbing, and walking on uneven ground.  (AR 358).  Dr. Bacchus further opined that due to his COPD, Scott should avoid working in extreme temperatures or around excessive dust, fumes, or chemicals.  (AR 359).

Also in February 2012, Ken Lovko, Ph.D., a state agency psychologist, reviewed Scott's record and completed psychiatric review technique and mental RFC forms.  (AR 361-78).  On the psychiatric review technique, Dr. Lovko found that Scott had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (AR 375).  On the mental RFC form, Dr. Lovko found that Scott was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; and responding appropriately to changes in the work setting.  (AR 361-62).  Dr. Lovko indicated that Scott was not significantly limited in the remaining 16 work-related mental activities.  (AR 361-62).

In his narrative assessment, Dr. Lovko noted that Scott was not taking psychotropic medications, was not currently receiving psychiatric treatment or psychotherapy services, and

had not been hospitalized for psychiatric reasons.  (AR 363).  Dr. Lovko concluded that Scott could understand, remember, and carry-out unskilled tasks without special considerations in many work environments; relate on at least a superficial basis on an ongoing basis with coworkers and supervisors; attend to task for sufficient periods of time to complete tasks; and manage the stresses involved with unskilled work.  (AR 363).  Kenneth Neville, Ph.D., another state agency psychologist, later affirmed Dr. Lovko's opinion.  (AR 430).

In March 2012, Earl Braunlin, M.D., performed an ophthalmology examination at the request of Social Security.  (AR 391-95).  He diagnosed mild myopia in both eyes, and presbyopia in both eyes due to Scott's age; he recommended that Scott obtain a pair of bifocal eyeglasses.  (AR 393).  Dr. Braunlin concluded that Scott should be able to work at something as far as his eyes were concerned.  (AR 393).

That same month, J.V. Cochran, M.D., a state agency physician, reviewed Scott's record and completed a physical RFC assessment.  (AR 396-403).  He concluded that Scott could lift 25 pounds frequently and 50 pounds occasionally; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; perform unlimited pushing and pulling within his lifting restrictions; frequently balance; and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation.  (AR 397-400).

In March 2012, Scott went to the emergency room due to swelling in his left elbow; he was diagnosed with olecranon bursitis.  (AR 412).  Bilateral breath sounds were clear, and his respirations were regular and unlabored; he denied any cough or shortness of breath.  (AR 410-11).  His mood and affect were normal.  (AR 412).  In April, Scott saw Keith Derickson, M.D.,

for a three-week history of swelling in his right elbow.  (AR 420).  Dr. Derickson noted Scott's

history of wheezing, but Scott did not have any difficulty breathing at the visit; rather, he had

normal breathing sounds without crackles, rhonchi, or wheezing.  (AR 420-21).  Scott saw

Denise Smith, D.O., in May and June 2012 for his elbow, and he told her that ibuprofen relieved

his elbow pain.  (AR 428, 442).  In May, Scott was noted to have scattered rhonchi and wheezes;

his inhaler was continued.  (AR 429).  In June, Scott's chest was clear.  (AR 442).  Scott returned

to Dr. Smith in July, complaining that his feet were swelling.  (AR 440).  He also complained of

waking up a few days earlier with difficulty breathing; he was without air conditioning at the

time.  (AR 440).  Dr. Smith noted that Scott had rhonchi throughout, and she continued Scott's

inhaler.  (AR 441; *see also* AR 443).

In August 2012, Scott was examined by Ronald Caldwell, M.D., an orthopedic surgeon,

for complaints of numbness and tingling in, and difficulty extending, his ring and small finger of

his left hand.  (AR 449-50).  Dr. Caldwell noted that Scott had some difficulty understanding

some of his questions even though he asked them in elementary terms.  (AR 449).  On physical

exam, Scott had full range of motion in his left elbow and shoulder, as well as excellent strength

in his shoulder.  (AR 449).  He exhibited minimal impingement-type signs.  (AR 449).  He had

some flexion that looked like a bit of clawing of his ring and small fingers, and his moving two-

point discrimination in those two fingers was somewhat prolonged.  (AR 449).  A Froment's sign

was positive, showing first dorsal interosseous weakness, but his radial pulse was excellent.  (AR

449).  Dr. Caldwell's impression was probable relatively severe ulnar neuropathy at the elbow.

(AR 450).  Dr. Caldwell ordered an EMG and explained to Scott that he might have a pinched

nerve in his elbow, which could require surgery.  (AR 450).  The EMG confirmed that there was

a conduction block in Scott's ulnar nerve at the elbow and evidence of acute denervation in the ulnar-innervated muscles of his left hand. (AR 464-65).

In October 2012, Matthew Snyder, M.D., performed a left ulnar nerve transposition on Scott. (AR 476-77). Several weeks later, Dr. Snyder wrote that Scott was doing very well and experiencing only minimal pain. (AR 474). The tingling in Scott's ring finger had ceased and he had just "a little bit" of tingling in his small finger; Dr. Snyder observed that the clawing that Scott had experienced preoperatively was gone. (AR 474). Scott demonstrated excellent range of motion and improved grip strength; his intrinsic muscles, although weak, were functioning. (AR 474). Scott had intact sensation in his ring finger, but diminished sensation in his small finger. (AR 474). Dr. Snyder recommended that Scott perform range of motion of his elbow, hand, wrist, and forearm as tolerated, and avoid lifting more than five pounds with his left upper extremity and any heavy lifting. (AR 474). He was to return to Dr. Snyder in four weeks. (AR 474).

In November 2012, Scott consulted H. Hamdi, M.D., because a week earlier he experienced a blackout and a seizure; he had experienced three such episodes in the past year. (AR 461). Dr. Hamdi's impression was a seizure disorder. (AR 463). Dr. Hamdi prescribed Keppra, ordered an MRI and EEG, and instructed Scott not to drive for six months. (AR 463).

That same month, Scott saw Marla Valcarcel, M.D., for his kidney problems. (AR 456-60). Dr. Valcarcel diagnosed chronic kidney disease–stage two. (AR 456). Dr. Valcarcel reviewed Scott's symptoms, which was positive for fatigue, snoring, cough, dyspnea, wheezing, depression, headache, paresthesia, back pain, and body aches. (AR 457-58). A physical exam revealed that Scott had clear lungs, a normal gait, an appropriate mood, and that he was in no

acute distress.  (AR 458-59).  An abdominal CT scan showed diffused fatty infiltration of the liver.  (AR 455).  There was an enlarged multicystic left kidney which appeared to represent severe hydronephrosis, as well as ureterectasis extending to the urinary bladder.  (AR 455).  There was no mass, and the source of obstruction was not identified.  (AR 455).  His lungs were clear to auscultation bilaterally.  (AR 458).

In December 2013, Scott's Medicaid benefits were reinstated.  (AR 479).  He was issued a nebulizer, and his prescriptions for his medications and inhalers were renewed.  (AR 480-88).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence,

11

reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### *A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir.

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

2001) (citation omitted).  A negative answer at any point other than step three stops the inquiry

and leads to a finding that the claimant is not disabled.  *Id.* (citation omitted).  The burden of

proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.

*Clifford*, 227 F.3d at 868 (citation omitted).

## B.  The Commissioner's Final Decision

On February 3, 2014, the ALJ issued the decision that ultimately became the

Commissioner's final decision.  (AR 18-33).  At the outset, the ALJ declined to reopen the

August 3, 2011, denial of Scott's prior application.  (AR 18).  Accordingly, the ALJ articulated

that *res judicata* applied through August 3, 2011.  (AR 18).

At step one of the five-step analysis, the ALJ found that Scott had not engaged in

substantial gainful activity since his alleged onset date.  (AR 21).  At step two, the ALJ found

that Scott had the following severe impairments: COPD, learning disorder/borderline intellectual

functioning, and remote history of right knee and ankle surgeries with residuals.  (AR 21).  At

step three, the ALJ concluded that Scott did not have an impairment or combination of

impairments severe enough to meet or equal a listing.  (AR 22-23).  Before proceeding to step

four, the ALJ determined that Scott's symptom testimony was not credible, and the ALJ assigned

him the following RFC:

> [T]he claimant has the [RFC] to perform a limited range of sedentary work . . . in
> that the claimant can sit six hours out of any eight hour work day; stand and/or
> walk two hours out of any eight hour work day; lifting, carrying, pushing and
> pulling ten pounds throughout the work day; only occasional kneeling, crouching,
> crawling, balancing or squatting; no ropes, ladders or scaffolds; occasional
> bending and stooping in addition to what is required to sit; occasional climbing
> ramps and stairs, one to two flights with rails.  The claimant is limited to simple
> repetitive tasks, can maintain the concentration required to perform simple tasks
> and can remember simple work-like decisions.  The claimant is further limited to
> only occasional decision-making and changes in the work setting.  The claimant

cannot engage in report writing or significant reading outside of very simple instructions and no reading of manuals. The claimant is limited from frequent exposure to concentrated and extreme amounts of airborne particulates such as fumes, dusts and gases.

(AR 24).

At step four, the ALJ noted that Scott had no past relevant work. (AR 31). Based on the RFC and the VE's testimony, the ALJ concluded at step five that Scott could perform a significant number of unskilled, sedentary jobs in the economy, including addresser, table worker, optical final assembler, eye glass frames polisher, and eye glass lens inserter. (AR 32). Therefore, Scott's application for DIB and SSI was denied. (AR 33).

### C. The ALJ Adequately Considered Scott's Medical Impairments In Combination When Determining His RFC

First, Scott argues that the ALJ failed to adequately consider his various ailments in combination when determining his RFC—specifically, his daytime sleepiness resulting from his depression and night-time coughing. Scott's lead argument, however, is unpersuasive.

"An ALJ must evaluate all relevant evidence when determining an applicant's RFC, including evidence of impairments that are not severe." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing 20 C.F.R. § 404.1545(a); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008)). "An ALJ must also analyze a claimant's impairments in combination." *Id.* (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). "[The Seventh Circuit Court of Appeals] upholds an ALJ's decision if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarify to permit meaningful review." *Id.* (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so

14

doing, he may not ignore entire lines of contrary evidence." *Id.* (citations omitted). "[T]idy

packaging" is not required in ALJs' decisions because the courts read them "as a whole and with

common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010)

(collecting cases).

In his step-two discussion, the ALJ specifically addressed Scott's testimony about his

sleep issues. The ALJ stated:

> Testimony was that the claimant experiences sleep issues with three to four hours
> of sleep before congestion wakes up the claimant. The medical treatment records
> do not document ongoing treatment aggressively sought and frequently received
> for congestion precluding sleep which is not amenable to treatment. Moreover,
> the medical treatment records do not document objective medical findings[] by
> treating physician of significant sleep deprivation and significant limitations of
> function, arising from such, lasting twelve months in duration, and despite
> treatment.

(AR 22). Scott does not acknowledge, must less address, the ALJ's consideration of his sleep

issues. (*See* DE 18 at 8-9; DE 28 at 1-2). Nor does Scott cite medical evidence or medical

source opinions that refute the ALJ's reasoning about his sleep issues. (*See* DE 18 at 8-9; DE 28

at 1-2). Instead, Scott relies solely on his own testimony about his sleep problems. (*See* DE 18

at 8-9; DE 28 at 1-2).

However, "[i]t is axiomatic that the claimant bears the burden of supplying adequate

records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702

(7th Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §

404.1512(c)); *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he

primary responsibility for producing medical evidence demonstrating the severity of

impairments remains with the claimant." (citation omitted)). "It is not unreasonable to require

the claimant, who is in a better position to provide information about his own medical condition,

to do so." *Bowen*, 482 U.S. at 146 n.5. Furthermore, "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).

Here, Scott fails to point to any medical evidence or medical source opinions supporting his claim that his sleep issues significantly impact his ability to function in the workplace. The RFC and the hypotheticals posed by the ALJ to the VE need to incorporate the claimant's impairments only "to the extent that the impairment is supported by medical evidence." *Jens*, 347 F.3d at 213 (citation omitted). On the record presented, it was reasonable for the ALJ to not assign Scott additional restrictions based solely on his testimony of sleep issues. Consequently, Scott's first argument does not warrant a remand of the Commissioner's final decision.

### D. The ALJ's Credibility Determination Will Not Be Disturbed

Next, Scott argues that the ALJ improperly discounted the credibility of his symptom testimony, asserting that he would be disabled if the ALJ had credited his testimony about his sleep problems and his difficulty using his left hand. For the following reasons, the ALJ's credibility assessment will not be disturbed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), his determination will

be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435. *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (citations omitted)).

The ALJ discounted the credibility of Scott's testimony of disabling limitations based on several factors. First, the ALJ cited numerous examples of objective findings, or lack thereof, that suggested Scott's symptoms were not of disabling severity. (AR 21-31). For example, Dr. Bacchus found that Scott's fine and gross dexterity were preserved, that he had no atrophy, and that he became only "mildly" short of breath during the examination. (AR 25-26 (citing AR 358)). Dr. Derickson observed that Scott had a mild limp, normal breathing sounds without crackles or wheezes, no edema, and just mild knee pain with full motion.[7] (AR 26-27 (citing AR 333-34). Dr. Braunlin stated that Scott's eye complaints would not prevent work and merely prescribed bifocal lenses. (AR 26 (citing AR 393)). Dr. Caldwell wrote that Scott's numbness and tingling in his left hand diminished after surgical intervention for a pinched nerve. (AR 28 (citing AR 474)).

The ALJ specifically observed that the record does not reflect ongoing observations of significant breathing difficulties, such as severe weakness, gross pulmonary hyperinflation, prolonged expiration, a depressed diaphragm, pursed lip breathing, a stooped posture, marked use of accessory muscles, or long-term atrophy related to significant and prolonged muscle

---

[7] In fact, Scott told Dr. Derickson that his knee pain did not interfere with his daily activities. (AR 334).

disuse related to a fatigue-induced lifestyle caused by a respiratory impairment. (AR 27). The ALJ also considered that Scott's treating physicians did not note significant deficits in strength, neurological function, range of motion, posture, sensation, reflexes, pulses, or gait of a 12-month duration; nor did they observe significant atrophy or spasm. (AR 29). Likewise, Scott's mental health records do note reflect significant deficits in mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, or demeanor of a 12-month duration. (AR 29-30).

"The discrepancy between the degree of [symptoms] attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating [his] condition." *Powers*, 207 F.3d at 435-36. Therefore, on the record presented, the ALJ reasonably concluded that the objective medical findings of record undercut Scott's claim of disabling limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").

Additionally, the ALJ considered the treatment, which was conservative in nature, that Scott had undergone for his various conditions. (AR 22, 24-31). For example, the ALJ observed that Scott had not required surgery or dialysis for his kidney problems; had not required frequent emergency room visits for uncontrollable symptoms despite treatment, including respiratory distress and mental impairments; and had not required prolonged hospital stays for frequent exacerbations. (AR 26-27, 29). Rather, the ALJ found that Scott's treatment had been "intermittent in nature" (AR 26), and he had not sought treatment through a pain clinic or work

hardening program (AR 29). He did not receive frequent or ongoing treatment by a psychiatrist, psychologist, or counselor. (AR 29). He declined a steroid injection, an MRI, and a physical therapy referral for his knee problems. (AR 334); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (affirming the ALJ's consideration of claimant's relatively conservative treatment history when discounting the severity of her symptom testimony, acknowledging that "the regulations expressly permit the ALJ to consider a claimant's treatment history" (citation omitted)); *Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints given the discrepancies between the severity of her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7, 1996 WL 374186, at *3, 8 (July 2, 1996). Nor does the record reveal that Scott complained to his physicians of persistent or adverse side effects from prescribed medications. (AR 30); *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (instructing an ALJ to consider the "type, dosage, effectiveness, and side effects" of any medication the claimant takes to alleviate his pain or other symptoms).

The Court observes that these reasons cited by the ALJ for discounting Scott's credibility are amply supported in the record. Nevertheless, in an attempt to overturn the ALJ's credibility determination, Scott nitpicks just a small portion of this evidence. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (In reviewing an ALJ's decision, the Court will "give the opinion a commonsensical reading rather than nitpicking at it." (citation omitted)). However, an ALJ's credibility assessment will stand as long as there is some support in the record. *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record," even though some of

the ALJ's findings were "a bit harsh").

First, Scott argues that the ALJ "played doctor" when he found that the absence of significant atrophy or spasm undercut Scott's complaints of disabling limitations from a prior injury to his right lower extremity. (AR 26, 29); *see Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996) (stating that an ALJ may not make independent medical findings about whether certain activities are inconsistent with a particular medical diagnosis). As a basic premise, 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2) instruct an ALJ to consider objective medical evidence such as reduced joint motion, muscle spasm, sensory deficit, or motor disruption, explaining that it "is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms . . . may have on [his] ability to work." Therefore, the ALJ was entitled to consider Scott's lack of significant atrophy or spasm. To the extent the ALJ went too far and "played doctor" when he found the lack of atrophy or spasm inconsistent with Scott's right lower extremity complaints when a doctor had not opined as such, that misstep by the ALJ does not materially undercut the wealth of other objective medical evidence cited by the ALJ in support of his credibility determination. *See Berger*, 516 F.3d at 545-46; *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher*, 869 F.2d at 1057 (citations omitted).

Next, Scott challenges the ALJ's observation that the record does not reflect that Scott experienced frequent respiratory distress or that he frequently visited the emergency room for uncontrollable breathing problems. (AR 26-27). But Scott does not dispute the accuracy of the

ALJ's statement; instead, he merely repeats his earlier argument that "the combination of his depression and breathing problems explain his sleep problems." (DE 18 at 11). For the reasons already explained, that argument lacks merit. In his reply brief, Scott attempts to expand his initial argument by suggesting that the ALJ played doctor in making this observation and that the ALJ improperly failed to consider that he had lost his Medicaid benefits. (DE 28 at 3).

But Scott's reply arguments fare no better than his initial argument. An ALJ is entitled to consider the objective medical evidence and the treatment that a claimant has pursued when assessing the severity of a claimant's symptom testimony. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). As such, the ALJ properly considered that the record does not reflect frequent bouts of respiratory distress or frequent emergency room visits. And as to the loss of Medicaid, Scott testified that he had received Medicaid up until several months before the September 2013 hearing, which the ALJ acknowledged in his decision. (AR 24, 45-46). The record, however, does not reveal frequent bouts of respiratory distress or frequent emergency room visits even when Scott did have Medicaid benefits.[8] Therefore, the ALJ did not unfairly consider that Scott did not experience frequent respiratory distress and did not frequently visit the emergency room for uncontrollable breathing problems.

Next, Scott contends that the ALJ "cherry-picked" the record of his emergency room visit in March 2012 for olecranon bursitis. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." (citation omitted)). Scott contends that the ALJ noted that he had denied allegations of

---

[8] Nor does the record indicate that Scott participated in a pain treatment or work hardening program during the period that he received Medicaid benefits. (AR 29).

disabling lower extremity issues, hypertension, and respiratory complaints at that visit, but that the ALJ did not acknowledge that he responded positively to symptoms of fatigue, snoring, cough, dyspnea, wheezing, edema, headache, depression, paresthesia, back pain, and body aches. (AR 27, 409-12). But in making this argument, Scott confuses the record, citing Dr. Valcarcel's consultation note from November 2012 rather than the emergency room records from March 2012. (*See* DE 18 at 11-12 (citing AR 457-58)). Contrary to Scott's assertion, the records from his March 2012 emergency room visit do not reflect that Scott responded positively to the foregoing symptoms. (*See* AR 406-17). As such, Scott's assertion that the ALJ "cherry-picked" the March 2012 emergency room report is without merit.

And to the extent Scott is contending that the ALJ erred by failing to discuss every symptom to which Dr. Valcarcel documented as "positive" in her review of systems, that argument, too, is unpersuasive. (*See* AR 28, 456-60). The ALJ's failure to expressly acknowledge all of the symptoms to which Scott responded positively during Dr. Valcarcel's interview does not rise to the level of ignoring an entire line of evidence that is contrary to the ALJ's ruling. *See Terry*, 580 F.3d at 477 ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." (citations omitted)). Particularly where Dr. Valcarcel's physical examination of Scott—in contrast to Scott's reporting of symptoms—revealed that Scott had clear lungs, a normal gait, an appropriate mood and affect, and that he was in no acute distress. (AR 458-59).

In his next argument, Scott criticizes the ALJ's consideration of Scott's use of a cane without a prescription. In that regard, the ALJ acknowledged Scott's testimony that he takes a cane with him wherever he goes, but the ALJ commented that the cane was not prescribed by a doctor and that Scott's use of a cane was not supported by findings of specific use and function

in accordance with Social Security Ruling 96-9p. (AR 25, 29); *see* SSR 96-9p, 1996 WL 3741865, at *7 (July 2, 1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed . . . ."). To the extent that the ALJ discounted Scott's credibility because his cane was not prescribed by a doctor, the Seventh Circuit has articulated that a claimant does not need a physician's prescription in order to use a cane. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription . . . ."). "[T]he fact that an individual uses a cane not prescribed by a doctor is not probative of [his] need for the cane in the first place." *Eaken v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2011) (citing *Terry*, 580 F.3d at 477-78). Therefore, Scott's challenge to the ALJ's discounting of his credibility for the reason that he used a cane without a doctor's prescription has merit.

Finally, Scott challenges the ALJ's consideration of the GAF score of 45 assigned by Dr. Martin in February 2012. (AR 30). But in doing so, Scott concedes that the ALJ was correct in stating that GAF scores do not have a direct relation to the severity requirements of Social Security's mental disorders listings and that an ALJ is not required to find a claimant disabled based solely on GAF scores. (DE 18 at 12-13); *see Denton*, 596 F.3d at 425 (stating that a GAF score may be "useful for planning treatment," but because the GAF score is a measure "of both severity of symptoms *and* functional level . . . [and] always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity" (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000))). Moreover,

as explained *supra* in footnote 5, the American Psychiatric Association no longer uses GAF scores as a metric.

In any event, Dr. Martin, who assigned the GAF score of 45, obviously did not view Scott as disabled, as she concluded that he was "able to work on jobs that require simple, repetitive, and well learned tasks that do not require good skills in reading or mathematics." (AR 354). The ALJ then adequately accommodated these limitations in the RFC and the hypotheticals posed to the VE by limiting Scott to simple, repetitive tasks that require only occasional decision making and occasional changes in the work setting with no report writing, reading of manuals, or significant reading outside of very simple instructions. (AR 24, 75-78. As such, Scott's challenge to the ALJ's credibility determination based on the ALJ's consideration of the GAF score of 45 assigned by Dr. Martin does not undercut the ALJ's credibility determination.

At the end of the day, "an ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'" *Berger*, 516 F.3d at 546 (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Although imperfect, the ALJ's credibility assessment is amply supported by the evidence of record—in particular, the objective evidence of record (or lack thereof) and Scott's conservative treatment history. The two flaws in the ALJ's assessment that Scott properly identified—"playing doctor" regarding the lack of significant atrophy or spasms and commenting on his use of a cane without a prescription—simply do not materially undercut the ALJ's reasoning in light of the wealth of other evidence cited by the ALJ. Ultimately, the ALJ built an adequate and logical bridge between the evidence of record and his conclusion about the credibility of Scott's symptom

testimony, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will stand.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Scott.

SO ORDERED.

Entered this 23rd day of September 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge